By the Court — Woodruff, J.
I am disposed to concur m the views expressed by the Referee in relation to the $3,000 note given by RT. L. McCready & Company to the Insurance Company, whose rights and interests are represented by the plaintiff.
There is nothing, I think, in the proofs given on this trial which shows that RT. L. McCready & Company were bound'on the 5th day of January, 1854, to pay to the Insurance Company any greater sum than had been earned for insurances made for the makers.
The witnesses, it is true, speak of this note as a subscription-note, but upon what terms it was given, for what especial purpose, and under what agreement, was not shown, except perhaps in one particular, viz., that to the extent that N. L. McCready & Company should insure and make payments on that note, to that extent N. L. McCready & Company, the makers, were entitled to five per cent for having advanced the note to the Company. And it may reasonably be inferred, that if that note had, before its maturity, passed by lawful transfer to the hands of a bona fide holder for value, the makers, being then bound to pay the whole note, might perhaps be at liberty to claim from the Company five per cent for having made the advance.
*339 But as between the Company and the makers no agreement is shown which, in terms or by implication, bound the makers to pay any greater amount than was earned in premiums; or in other words, which would preclude the makers from alleging and showing that, except to the extent of premiums earned, the note was without consideration, and that they were to pay to the Company no sum greater than the amount of such premiums.
And so the note was in fact treated by the Company when it became due, i. e., while the makers paid it in full, the Company refunded so much of the consideration as had not been earned.
The plaintiff in this action assumes that what the witnesses call a subscription note, has the character and involves all the obligations which attach to a note given under the 12th section of various acts incorporating other insurance companies, which notes are by statute made valid binding notes, whether the premiums of insurance for which they are prospectively advanced are ever earned or not, according to the construction given to that section in numerous cases. (1 Sand., 159; id., 629; 3 id., 176; 1 Comst., 371; 4 Seld., 312; 3 Comst., 290; 4 id., 51.)
And a like effect is given to notes advanced to make up the capital of Insurance Companies organized under the general Insurance Act of April 10, 1849. (Laws of 1849, ch. 308, § 5, p. 442; White v. Haight, 16 N. Y. R., 310; Elwell v. Crocker, 4 Bosw. R., 22.)
But the act incorporating the General Mutual Insurance Company contains no such section as the twelfth section above referred to; and the note was not shown to have been given to make up a capital for the Company, or to be used as the basis of credit. The Company was incorporated in 1841, (Laws of 1841, p. 229 ; id., 1842, p. 138;) and the so-called subscription note was not given until January, 1853.
The former President of the Company, in his testimony on the trial, describes the arrangement under which it was given thus: “ I know that a subscription note for $3,000 was given by H. L. McCready & Company, in advance of premiums, with a good many other notes by other parties of different amounts: they were given in January, 1853, and were due in January, 1854.” * * “ The subscription notes are given for premiums to be earned by the Company on risks effected with the Company.” * * “ The *340 usual mode of settling subscription notes was to renew the balance of the note, (the difference between the premiums given the Company and the note,) for twelve months,” ** * “ the makers having been credited, in account, with five per cent on the amount used. That allowance of five per cent was made on all subscription notes: that was part of the agreement made with the parties.”
• In the absence of any statute applicable to the taking of notes by this Company; and in the absence of other or further proofs in relation to the arrangement under which these notes were given, or the purposes to which they were to be applied; the transaction so described indicates an advance of notes for the accommodation of the Company which they might no doubt use for the purposes of their business, but which they were to earn by the premiums of insurance which the makers might effect with them, and which were subject to renewal to the extent or amount unearned at the time the notes became due; and for this accommodation the makers were to receive five per cent on such sum as was received in premiums and paid by the makers.
Under such an arrangement it is by no means clear that the Company could collect on such notes any greater amount than was earned in premiums; and if it be conceded that the Company might insist that the makers were bound to insure from time to time until the whole amount had been in fact earned, still, if the Company became insolvent while holding the note, and so became unable to fulfill its part of.the agreement, the consideration would fail; and, as between the immediate parties, (the Company and the makers,) we perceive nothing in the arrangement to prevent the makers from insisting on an exoneration from any liability beyond the amount earned.
Still less do we discover in this arrangement anything which could prevent the Company and such makers, acting in good faith, from making any new and substituted agreement to which both should assent, especially if it was made upon a distinct consideration moving thereto.
It is found by the Referee, and the proof clearly shows that this was done. A new note was given for the balance of the note not earned, in which a third person, not before in any manner bound, (the defendant Brundage,) joined, at the expiration of *341 the first twelve months, i. e., at the maturity of the note for $3,000. This new note was made payable at seven months. It was expressly understood that it should be what is termed an open policy note, or a note for the unearned premium of an open policy issued at the same time to the makers. The $3,000 note was paid, and so much thereof as had not been earned was refunded.
It is difficult to see that there was in this anything which was not within the clear authority and power of the Company to do, if they saw fit. They were not under any obligation arising out of any statute, or implied in the original arrangement, as testified to, to retain the $3,000 note, or to insist upon its full payment, even if it were conceded that they might have done so, offering at the same time to give insurance to a corresponding amount.
They obtained thereby the obligation of a new partner (in the firm of McCready, Mott & Company.) A policy was issued to such new makers. Insurances were entered thereon, and the whole transaction bears the mark of good faith, and we are not able to see in it, upon the case as presented to us, any ground for impeaching it as fraudulent or illegal. And therefore, if the question before us was, whether the original makers of the $3,000 note still remained liable, notwithstanding this substituted transaction, we should find it difficult, upon any proofs in the cause, to say that they were not fully exonerated from any liabilty except according to the tenor and effect of the new arrangement.
It is quite clear that the defendant, Brundage, never was liable on the $3,000 note, and therefore that he is not liable, unless he is bound to pay the note now in suit. The stipulation contained in the case admits that the $3,000 note was made by McCready and Mott only, while the note in suit was made by the three defendants, but that this fact “is to have no effect upon the decision of the case except so far as it may tend to show the purpose for which the note sued upon was made and delivered.”
We are somewhat in doubt as to the proper construction to be given to this stipulation. The fact that a note executed by a new firm was given is (as already noticed,) a significant one as showing not only that a mere renewal of the unearned portion of the $3,000 was not all that the parties contemplated, but also *342 that a new consideration existed for making the substituted arrangement; and further, it served to characterize the new transaction as made in good faith, and as the basis of further new relations between the parties under the open policy then taken out and the insurances entered thereon.
We can hardly think the stipulation was intended to mean that judgment may be entered against Brundage, if McCready & Mott should be deemed liable for the unearned balance of the $3,000 note. The Referee does not appear to have so understood the stipulation — and the power of the attorney to make such a stipulation is not free from doubt.
The utmost that it can reasonably import is, I think, that if upon any grounds, McCready & Mott are liable upon the note in suit, Brundage is conceded to be liable with them.
It has been very decidedly intimated that after the taking up of the $3,000 note the makers thereof were only liable according to the terms of the new arrangement, and if so, the construction of the stipulation-is not material, for if, in that view, it be held to mean that if McCready & Mott are liable upon any ground in this action, judgment may be pronounced against Brundage also; still, the liability of the parties must depend on the nature and legal effect of the new arrangement.
By that arrangement an open policy was issued, and a note executed for the premiums for the risks to be thereafter indorsed thereon.
Upon a note, so given, it has been repeatedly declared that the liability of the makers only extends to the premiums for the risks actually taken by the Company. This subject was fully discussed in this Court in Elwell v. Crocker, decided, December, 1858, and the cases on the subject are there referred to. (4 Bosw. R., 22; 1 Sandf., 53, 184, 640, 641; 1 Comst., 371; 16 N. Y. R., 310.)
The cpmplaint herein proceeds solely upon the alleged liability of the defendants upon the note in suit. And if the defendants are not liable upon that, it would be changing the cause of action entirely in its scope and meaning, if the plaintiff were permitted to convert an action brought on a promissory note made by the three defendants, and proved to be so made, into an action founded on a liability of two of the defendants upon a previous *343 note made by them and given up and canceled. So that if we were of opinion that the $3,-000 note was improperly surrendered, or that the Company or the plaintiff were not bound by the substituted arrangement, we incline to the view taken by the Referee, that there could be no recovery in this action, but that the failure of the plaintiff to establish a right to recover on the note in suit must be deemed not “a case of variance, but a failure of proof.” (Code, § 171.)
This consideration, however, in the view we have taken of the plaintiff’s rights, does not arise, for there is, we think, a ground of recovery, which appears to have been overlooked by the Referee, entitling the plaintiff to a portion of the amount of the note. And if so, the plaintiff does recover upon the very cause of action which he has alleged, and being entitled to recover upon that cause of action, the impropriety of permitting the plaintiff also to recover upon a cause of action not alleged, and upon grounds not set up in the complaint becomes even more obvious.
The amount of insurance under this open policy actually effected entitled the Company to premiums to the amount of $139.40; and, even though the Company had continued perfectly solvent, that sum is all which could have been collected upon the open policy note against these defendants. Of such a note, Mr. Justice Sandford says, in Brouwer v. Hill, (1 Sandf., 641,) the makers “ are not responsible thereon beyond the amount of premiums actually earned by the Company; and the dealer has a right to cancel such a policy at any time and receive back his note, deducting the amount of earned premiums.”
In this case, when risks had been indorsed entitling the Company to $139.40 for premiums, the policy was canceled by mutual consent. The Company was discharged from all liability upon its policy, and the defendants consented to look to .the dividends which might ultimately be made to its creditors for their return premium. In this transaction there was a distinct recognition of the right of the Company to have that amount, $139.40, as premium on risks taken, and a like clear right in the defendants to have that sum returned upon the cancellation of the policy and the release of the Company from the insurance. Now, if the' Company had at that time been solvent, it would have been, in *344 all respects, right and proper for the one claim to be setoff against the other. But it was not inequitable for the officers of the Company to insist upon receiving payment of this premium as a part of the fund to be distributed ratably among all the creditors, and to require the defendants to take their chance, as creditors, of receiving back their return premium out of the general fund. And this was made a condition of the cancellation, and conforms to the proper construction of the indorsement then made on the policy.
The plaintiff was, therefore, entitled to recover from the defendants the $139.40; and, on payment of that sum, the defendants become creditors to that amount, in addition to the amount to which the Referee declared them to be creditors on other grounds. That sum, and that only, is due on the note, and for that the plaintiff was entitled to a judgment; while, on the other hand, the judgment should declare the amount due to the defendants, and upon which they are entitled to dividends, to be greater by a corresponding addition.
There must be a new trial, with costs to abide the event, unless the plaintiff elects to make the judgment conform to the views last above expressed, in which case the judgment may be to that extent affirmed, without costs to either party on the appeal.
Ordered accordingly.